**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **ZHENGYU HE, individually and on behalf of all others similarly situated,** | Civ. No. 2:18-15530 (KM-JAD) |
| **Plaintiff,** | |
| **v.** | **OPINION** |
| **CHINA ZENIX AUTO INTERNATIONAL LIMITED, JIANHUI LAI, and MARTIN CHEUNG,** | |
| **Defendants.** | |

**MCNULTY, U.S.D.J.:**

The plaintiffs have filed a putative class action alleging securities fraud against China Zenix Auto International Limited ("China Zenix" or the "Company") and certain of its senior officials (*See* 1AC (DE 23)).[1] The allegations stem from purportedly false or materially misleading statements and omissions made by the defendants in various public disclosures, as well as an alleged stock manipulation scheme. Plaintiffs assert that these false and materially misleading statements violated Section 10(b) and Section 20(a) of the Exchange Act, and that the manipulation scheme violated Section 9(a) of the Exchange Act.

Currently before the Court is Defendants' motion to dismiss the first amended complaint for failure to state a claim and for lack of personal

---

[1]    Citations to certain record items will be abbreviated as follows:

   DE = Docket entry number

   1AC = Plaintiffs' First Amended Complaint (DE 23)

   Def. Brf. = Defendants' Brief in Support of the Motion to Dismiss Plaintiffs' First
       Amended Complaint (DE 30-1)

   Pl. Opp. = Plaintiffs' Brief in Opposition (DE 30-2)

   Def. Reply Brf. = Defendants' Reply Brief to Plaintiffs' Opposition (DE 30-3)

jurisdiction. *See* Fed. R. Civ. P. 12(b)(6); 12(b)(2). For the reasons stated below, the motion to dismiss is granted in part and denied in part.

## I.   FACTUAL BACKGROUND

In considering a motion to dismiss, the Court is required to treat the facts alleged in the complaint as true and to draw all reasonable inferences in the plaintiffs' favor. I summarize those allegations as follows:

### A.  *Relevant Parties and Participants*

The plaintiffs, ITENT EDV Dienstleistungs GmbH and Ing. Richard Deutner Softwaeentwicklung & Beratung, seek to represent a class consisting of all those (other than the Defendants and their affiliates) who purchased publicly traded securities issued by Defendant China Zenix from October 2, 2015 through June 14, 2018 (the "Class Period"). (1AC ¶ 1). Plaintiffs purchased such securities during the Class Period. (*Id.* ¶ 16).

Defendant China Zenix is based in the People's Republic of China and incorporated under the laws of the British Virgin Islands. (*Id.* ¶ 18). It designs, manufactures, and sells wheels for commercial vehicles. (*Id.*). In 2011, China Zenix completed an initial public offering of American Depository Shares ("ADS"), each of which represented four of the Company's ordinary shares. (*Id.* ¶ 19). The ADS traded on the New York Stock Exchange ("NYSE") from May 11, 2011 until June 14, 2018, and currently trade on the over-the-counter market. (*Id.*).

Defendant Jianhui Lai is the Company's founder. (*Id.* ¶ 20). During the Class Period, he served as CEO and Chairman of the Company's Board of Directors. (*Id.*). Defendant Martin Cheung has served as the Company's Chief Financial Officer since March 2014. (*Id.* ¶ 21).

Lai beneficially owns approximately 70% of the Company's ordinary shares through his sole ownership of Newrace Limited, China Zenix's Virgin Islands-based holding company. (*Id.* ¶ 28). Additionally, multiple members of his family are involved with the Company, serving as directors or officers of the

Company's operating subsidiary. (*Id.* ¶ 29). Indeed, the Company "operates much like a family business." (*Id.* ¶ 30). Lai's substantial ownership is unique; no other director or executive officer of the Company holds more than 1% of its total outstanding ordinary shares. (*Id.* ¶ 32).

### B. Alleged Material Omissions

Plaintiffs' allegations center on an NYSE regulation requiring the average closing price of a security traded on the exchange to be greater than or equal to $1.00 over a period of 30 trading days. (*Id.* ¶ 35). If the price dips below $1.00 for a given period, the NYSE notifies the company and allows it a six-month cure period to raise the price. (*Id.*). If, at the end of the cure period, the price has remained below $1.00 for the previous 30 trading-days, then the NYSE is permitted to delist the company. (*Id.*).

On August 18, 2015, China Zenix issued a press release revealing that the Company had been notified it was in violation of this policy. (*Id.* ¶ 36). On October 2, 2015, the Company issued a press release announcing that it had cured the violation and raised the price above the applicable threshold, bringing it into compliance with "all NYSE continued listing requirements . . . ." (the "October 2015 Press Release"). (*Id.* ¶ 39).

Plaintiffs allege that the October 2015 Press Release was misleading because it failed to disclose three facts: (1) that the Company knew its employees and others were trading the ADS in an improper manner following the notification from the NYSE; (2) that this improper trading was the true reason the Company was able to comply with the $1.00 price requirement; and (3) that the Company faced a material risk of being delisted by the NYSE because of this improper trading and its knowledge thereof. (*Id.* ¶ 40).

On April 28, 2016, the Company filed its annual report for the fiscal year ending December 31, 2015 with the Securities and Exchange Commission ("SEC") on Form 20-F (the "2015 Annual Report"). (*Id.* ¶ 41). The 2015 Annual Report was accompanied by a certification filed pursuant to the Sarbanes-Oxley Act of 2002, signed by Lai and Cheung (the "2015 SOX"). (*Id.* ¶ 42). Each

3

signatory certified that the 2015 Annual Report was accurate, that it did not contain any untrue statement of a material fact, and that he had disclosed to the Company's auditor and audit committee any fraud involving Company management or employees with a significant role in controlling the Company's financial reporting. (*Id.*). These statements were allegedly misleading for the same reasons as the October 2015 Press Release. (*Id.* ¶ 45).

On May 27, 2016, the Company issued a press release stating that it had again been notified by the NYSE that it was not in compliance with the minimum price threshold. (*Id.* ¶ 44). On September 2, 2016, it issued a press release announcing that it was back in compliance the NYSE's minimum price requirements (the "September 2016 Press Release"). (*Id.* ¶ 46). This announcement, like the October 2015 Press Release, was allegedly misleading because the Company omitted its knowledge of the improper trading that had produced the increase in the share price. (*Id.* ¶ 47).

On April 28, 2017, the Company filed its annual report for the fiscal year ending December 31, 2016 (the "2016 Annual Report"), as well as a certification signed by Lai and Cheung (the "2016 SOX"). (*Id.* ¶¶ 48, 49). These statements were allegedly misleading for the same reasons as the 2015 Annual Report and 2015 SOX. They were additionally misleading because there had been additional improper trading following the May 2016 notification from the NYSE that the Company was not meeting the minimum price threshold. (*Id.* ¶ 50).

Finally, on April 27, 2018, the Company filed its annual report for the fiscal year ending December 31, 2017 (the "2017 Annual Report"). The 2017 Annual Report was accompanied by another certification signed by Lai and Cheung (the "2017 SOX"). (*Id.* ¶¶ 51, 52). These were allegedly misleading for the same reasons as the 2016 Annual Report and the 2016 SOX. (*Id.* ¶ 53)  This time, the Company disclosed that in July of 2017, the NYSE had requested information regarding the Company's "knowledge of the trading conducted by certain persons, including a number of Company employees, in the Company's

stock during certain periods in 2015 and 2016." (*Id.* ¶ 54). That disclosure warned that "[i]f the NYSE believes it is warranted, it can remove the Company's stock from listing on its exchange." (*Id.*). Plaintiffs allege that this statement is misleading for the same reasons as the 2016 and 2017 Annual Reports and SOX certifications: *i.e.*, the Company's knowledge that improper trading had occurred and that this trading had created a material risk of delisting. (*Id.* ¶ 55).

### C. Subsequent Developments

On June 14, 2018, the NYSE commenced delisting proceedings against the Company. (*Id.* ¶ 56). The NYSE announced the delisting in a press release:

> The determination to delist the Company was based on an investigation conducted by NYSE Regulation that brought to light the existence of events that made further dealings or listing of the securities on the Exchange contrary to the public interest and not in keeping with sound public policy, pursuant to Section 802.01D of the Listed Company Manual.

(*Id.* ¶ 56).

The next day, the Company issued its own press release announcing its intent to appeal the NYSE delisting decision (the "June 2018 Press Release"):

> The delisting decision was made by the NYSE staff in relation to a review of the trading of the Company's stock during certain periods in 2015 and 2016 when its stock price fell below the NYSE minimum price requirement. The Company was disappointed by the decision of the NYSE staff and disagrees with their factual findings. The Company has decided to appeal against the NYSE delisting decision. In the meantime, the Company will apply for its common stock to be quoted and traded on the OTCQX.

(*Id.* ¶ 60).

On June 18, 2018, the Company resumed trading, now on the over-the-counter exchange, under a new stock ticker symbol. (*Id.* ¶ 58). On the first day of trading, the price fell 42% from the previous closing price. (*Id.*). On December 11, 2018 the Company issued a press release announcing that a committee of the Board of Directors of the NYSE had affirmed the exchange's decision to delist the Company's ADS. (*Id.* ¶ 62).

5

### D.  Procedural History

Plaintiffs assert the following causes of action:

1.  Violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC (against the Company, as well as Lai and Cheung individually)
2.  Violation of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) (against Lai and Cheung individually)
3.  Violation of Sections 9(a) and 9(f) of the Exchange Act, 15 U.S.C. § 78i(a) & (f) (against the Company, as well as Lai and Cheung individually)

The original complaint was filed by Zhengyu He on October 31, 2018. (DE 1). On February 17, 2019, Magistrate Judge Dickson granted an order appointing Plaintiffs as lead plaintiffs for the proposed class. (DE 12). Plaintiffs filed the First Amended Complaint on April 23, 2019 (1AC, ECF No. 23). Defendants' motion to dismiss was entered on the docket on September 11, 2019. (DE 30-1). Plaintiff filed a response (DE 30-2) and Defendants filed a reply (DE 30-3). For the following reasons, Defendants' motion to dismiss is granted in part and denied in part.

## II.    APPLICABLE LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint if it fails to state a claim upon which relief can be granted. The defendant, as the moving party, bears the burden of showing that no claim has been stated. *Animal Science Products, Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n.9 (3d Cir. 2011). For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *New Jersey Carpenters & the Trustees Thereof v. Tishman Const. Corp. of New Jersey*, 760 F.3d 297, 302 (3d Cir. 2014).

When deciding a motion to dismiss, a court typically does not consider matters outside the pleadings. However, a court may consider documents that are "integral to or explicitly relied upon in the complaint" or any "undisputedly

6

authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999) (emphasis and citations omitted); *see In re Asbestos Prods. Liab. Litig. (No. VI)*, 822 F.3d 125, 133 n.7 (3d Cir. 2016); *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).

In that regard, courts may consider matters of public record and exhibits attached to the complaint. *Schmidt*, 770 F.3d at 249 ("To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record"); *Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 292 (D.N.J. 2009) (court may consider documents referenced in complaint that are essential to plaintiff's claim). That exception rests on the rationale that "[w]hen a complaint relies on a document . . . the plaintiff obviously is on notice of the contents the document, and the need for a chance to refute evidence is greatly diminished." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196-97 (3d Cir. 1993).

Plaintiffs pleading securities fraud claims pursuant to Section 10(b) of the Securities Exchange Act and Rule 10b-5 must exceed the requirements of Rule 8; they must meet a heightened pleading standard as set forth in the PSLRA. 15 U.S.C. § 78u-4(b)(1). Under the PSLRA, plaintiffs bringing a claim involving an allegedly false or misleading statement must: "(1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,' 15 U.S.C. § 78u–4(b)(1), and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,' § 78u–4(b)(2)." *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 242 (3d Cir. 2013) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007)) (internal quotations omitted). The required state of mind is "scienter," which is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Id.* (quoting *Tellabs*, 551 U.S. at 319).

Both provisions of the PSLRA pleading standard require that facts be pled "with particularity," echoing the requirement set forth in Fed. R. Civ. P. 9(b). *Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009); *see* Fed. R. Civ. P. 9(b) (a party must state with particularity the circumstances constituting fraud or mistake."). Therefore, although the PSLRA supplanted Rule 9(b) as the pleading standard governing private securities class actions, Rule 9(b)'s particularity requirement is effectively subsumed by the requirements in Section 78u-4(b)(1) of the PSLRA. *Id.* (*citing Miss. Pub. Employees' Ret. Sys. v. Boston Sci. Corp.*, 523 F.3d 75, 85 n. 5 (1st Cir.2008)). This standard requires that plaintiffs plead the "who, what, when, where and how." *Id.* (citing *In re Advanta Corp. Secs. Litig.*, 180 F.3d 525, (3d Cir. 1999)). Section 78u-4(b)(1) also adds an additional requirement where "an allegation regarding [a defendant's] statement or omission is made on information or belief." Id.;15 U.S.C. § 78u–4(b)(1). In such cases, plaintiffs must also "state with particularity all facts on which that belief is formed," that is, they must describe the sources of information with particularity, including the who, what, when, where and how of the sources, as well as the who, what, when, where, and how of the information conveyed by those sources. *Id.*

The PSLRA's approach for pleading scienter sharply deviates from that under Rule 9(b), which permits plaintiffs to plead the scienter element generally. *Id.* Under the PSLRA, the Court must evaluate whether all the facts in the complaint as alleged, taken collectively, give rise to a "strong inference of scienter." *Tellabs*, 551 U.S. at 323. In determining whether the pleaded facts together give rise to a strong inference of scienter, the Court must take into account plausible opposing inferences. *Id.* This involves a comparative inquiry that evaluates how likely is one conclusion as compared to others, in light of the pleaded facts. *Id.* Therefore, the Court must consider plausible, nonculpable explanations for the defendant's conduct as well as inferences favoring the plaintiff. Id. Although the inference that the defendant acted with scienter need not be irrefutable, it must be more than merely "reasonable" or

"permissible." *Id.* A complaint will survive only if a reasonable person would "deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

These pleading requirements apply whether the alleged fraudulent statement at issue is an assertion of current fact or a prediction of the future. *Avaya*, 564 F.3d at 253-54. However, when an allegation involves a prediction, the Safe Harbor Provision of the PSLRA immunizes from liability any forward-looking statement provided that "the statement is identified as such and accompanied by meaningful cautionary language; or is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood." *Id.* at 254; 15 U.S.C. § 78-u-5(c).

### III.   ANALYSIS

Section III.A analyzes Plaintiffs' 10(b) misrepresentation claim under the Exchange Act. Section III.B discusses the Section 9(a) claim, and Section III.C covers the Section 20(a) claim. Section III.D discusses this Court's personal jurisdiction over Defendants Lai and Cheung.

### A. Exchange Act Section 10(b) and Rule 10b-5 (Count 1)

To state a claim for securities fraud under Exchange Act Section 10(b) and Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014). As discussed in detail above, the first two elements must be pled with particularity. *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009).

Defendants argue that Plaintiffs have not described the alleged omissions or pled scienter with sufficient particularity, and have not adequately pled loss causation.

9

### 1. Material Omissions

Plaintiffs do not argue that Defendants' statements were literally false.[2] Instead, they argue that Defendants omitted information and that those omissions rendered the statements misleading. Omissions are actionable when the omitted fact would be "necessary . . . to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). An omission is materially misleading if "there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available'" to that investor. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38, 131 S. Ct. 1309 (2011) (quoting *Basic v. Levinson*, 485 U.S. 224, 231-32, 108 S. Ct. 978 (1988) ); *In re Amarin Corp. PLC Sec. Litig.*, 689 F. App'x 124, 129 (3d Cir. 2017).

### a) October 2015 Press Release and September 2016 Press Release

Plaintiffs point first to the October 2015 Press Release and the September 2016 Press Release, both of which announced that the Company had regained compliance with the NYSE's minimum price threshold of $1.00 per share. The omission is that the press releases failed to inform investors that the Company regained compliance through improper trading by Company employees, an impropriety which created a material risk that the Company would be delisted. Assuming the truth of these allegations, the omitted information does render the statements misleading. It is substantially likely that investors informed of this fact would have changed their opinion of the situation. Instead of concluding that the Company's share price rebounded naturally or fortuitously, an investor would have been alarmed that the share price rebounded through improper means. That alarm would only be

---

[2]     Plaintiffs do seem to allege that the SOX certifications were false, in that they certified that the annual reports contained no misleading omissions. The underlying issue is an omission, however, and I analyze it as such.

heightened by the concomitant risk that the NYSE would delist the Company, a risk that ultimately did materialize.

Defendants argue that this allegation is too vague and that Plaintiffs have not described the omissions with particularity. Defendants misconstrue the particularity requirement. Plaintiffs are required to plead with particularity the omission, not all of the underlying misconduct. The "who, what, when, where and how" have been pled. For the press releases, Plaintiffs clearly state who made the misleading statements (the Company), what the material omissions were (improper trading), when they were made (October 2015 and September 2016), where they were made (in the press releases), and how they were misleading (they neglected to inform investors of the true means by which the Company regained compliance with the $1.00 per share requirement).

That is not to say that allegations of wrongdoing need not be pled at all; they provide essential background to the allegation of an omission. And when allegations of wrongdoing are made upon information and belief, the plaintiff must state the facts on which that belief is based. Plaintiffs do not use the phrase "information and belief," but they have pled facts that would inferentially suggest improper trading that inflated the share price to bring it above the $1.00 level. The phrase "improper trading" can reasonably be inferred to mean "stock trading methods that run afoul of NYSE regulations and would lead to delisting if discovered." The allegation that Company employees participated in improper trading is based on the Company's own 2017 Annual Report, in which the Company stated that the NYSE was investigating its knowledge of "trading conducted by certain persons, including a number of Company employees, in the Company's stock during certain periods in 2015 and 2016." (1AC ¶ 54). That implication is supported by a key subsequent fact: The NYSE delisted the Company "based on an investigation . . . that brought to light the existence of events that made . . . listing . . . contrary to the public interest and not in keeping with sound public policy . . ." (*Id.* ¶ 56).

11

Taken together, these facts — the surrounding circumstances of which are particularly described —serve as the basis for Plaintiffs' belief that the Company was improperly trading and should have disclosed that information to investors in its October 2015 and September 2016 Press Releases. Plaintiffs cannot be expected at this stage to have a grasp of the exact contours of the improper trading scheme; those facts, assuming they occurred, would more likely be in the control of Defendants and others. What matters is that, as to the October 2015 and September 2016 Press Releases, Plaintiffs have pled with the requisite particularity both the misleading statements and the basis for the belief that the statements would mislead an investor as to the underlying facts.

### b)  SOX Certifications

Applying a similar analysis, Plaintiffs argue that the 2015, 2016, and 2017 SOX certifications were likewise misleading. In those SOX certifications, Lai and Cheung each certified that the accompanying annual reports did not contain any untrue statement of material fact and that they had disclosed to the audit committee any fraud conducted by management. According to Plaintiffs, the annual reports ought to have disclosed the stock manipulation scheme carried out by Company employees. In failing to disclose that information, the annual reports were misleading. Therefore, by certifying in the 2015, 2016, and 2017 SOXs that misleading reports were true, Lai and Cheung made statements that were false and misleading.

Here, Defendants argue only that the SOX certifications cannot be actionable because they were knowledge-qualified. That argument is more appropriately leveled at the element of scienter, which I consider separately. *See* Section III.A.2, *infra*.

Plaintiffs cite two cases for the proposition that misleading SOX certifications are actionable under Section 10(b). Both held that the SOX certifications were misleading because they vouched for misleading financials and related information contained in the accompanying annual report. *See In re Toronto Dominion Bank Sec. Litig.*, Civ. No. 17-1665, 2018 WL 6381882, at

*10 (D.N.J. Dec. 6, 2018) (holding that SOX certifications were actionable because plaintiffs had pled that the company's internal controls were deficient); *City of Roseville Employee's Retirement System v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 419 (D. Del. 2009) (holding that financial report was misleading because the company did not disclose that some of its revenue was obtained unlawfully).

SOX certifications are not disclosure documents *per se.* Rather, they verify the accuracy and completeness of disclosures, *i.e.,* the information contained in the annual report. Plaintiffs' argument that a SOX certification was misleading must rest on a sufficient allegation that the corresponding annual report was misleading. I therefore analyze each annual report and SOX certification in tandem.

As for the 2015 Annual Report and 2015 SOX, Plaintiffs have not pled any facts indicating that misleading statements were contained in the annual report. In fact, Plaintiffs do not cite to any language in the 2015 Annual Report at all. For the Court to draw a reasonable inference that the annual report was misleading, Plaintiffs must put forth some facts regarding the contents of the annual report, along with a clear explanation of why those statements are misleading. Because Plaintiffs have failed to do so, the 2015 SOX is not sufficiently alleged to be actionable.

The same analysis applies to the 2016 Annual Report and 2016 SOX. Because Plaintiffs have not pled any facts as to the contents of the 2016 Annual Report, it cannot be inferred that the 2016 SOX was misleading. Whether this *could* be alleged, as Plaintiffs seem to argue in their brief, is not the point; it has not been alleged.

As to the 2017 SOX, however, Plaintiffs have tied their allegations to specific statements in the 2017 Annual Report that were rendered misleading. In the 2017 Annual Report, the Company discussed the NYSE's investigation into its trading practices. The Company accurately disclosed that the NYSE requested information regarding its knowledge of trading conducted by

Company employees, and it further disclosed that this investigation might lead to delisting. Plaintiffs argue that these disclosures were nonetheless misleading because the Company downplayed the risk of delisting. The Company, according to plaintiffs, did not merely know that it was being investigated; it knew it was guilty of the conduct the NYSE was investigating. Plaintiffs argue that the risk of delisting, an event which would affect the stock price, was therefore much higher than the disclosure implied.

Plaintiffs cite *Menaldi v. Och-Ziff Capital Management Group LLC*, 164 F. Supp. 3d 568, 583-584 (S.D.N.Y. 2016) for the proposition that downplaying the materiality of an investigation is actionable under Section 10(b). However, the statements at issue in that case were of a different nature. The company disclosed generally that it was, like other companies, subject to regulatory scrutiny; it also stated that it was not then facing any investigation that it expected would have a material impact on its business. *Id.* at 583. This was misleading because the company had in fact been subpoenaed by the SEC and the Department of Justice, and the investigation was likely to have a material impact on its business. *Id.* at 584.

Here, the 2017 Annual Report did not downplay the extent of the investigation, as did the disclosure in *Menaldi*. But the Company did allegedly fail to apprise investors of the risk that the investigation would lead to delisting. True, the Company disclosed the existence of the investigation and some attendant risk. But an investor reading that disclosure would draw a very different conclusion than an investor apprised of critical facts that the Company withheld. Those critical facts were that the trading practices being investigated had in fact occurred; that they were in fact improper; and that the Company knew it. That is an adequate allegation that the disclosure of the investigation in the 2017 Annual Report was misleading.

The complaint specifies exactly which statements in the 2017 Annual report were misleading and why they were misleading. And, as discussed above, Plaintiffs have pled a basis for their belief that improper trading had

14

occurred. Accordingly, Plaintiffs have pled that the 2017 Annual Report was actionably misleading under Section 10(b).

The 2017 SOX certified that the information contained in the 2017 Annual Report was accurate. That information, however, has been adequately alleged to be misleading. This certification is therefore adequately alleged to be misleading as well, and the 2017 SOX is sufficiently alleged to be actionable under Section 10(b).

I summarize: Of the statements cited by Plaintiffs, the following are actionable under Section 10(b): the October 2015 Press Release, the September 2016 Press Release, the 2017 Annual Report, and the 2017 SOX. Plaintiffs have described these statements with particularity by alleging the specific statements that were misleading and the reasons why they were misleading. They have also pled a factual basis for their reasoning. That is sufficient at this stage for the first prong of the analysis. Other statements, such as those contained in the 2015 and 2016 Annual Reports and corresponding SOX certifications, have not been adequately alleged to be misleading.

### 2. Scienter

To establish scienter on the part of the Defendants, Plaintiffs must "state with particularity facts giving rise to a strong inference that the Defendants acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). That state of mind the Third Circuit has "described as one 'embracing [an] intent to deceive, manipulate, or defraud,' either knowingly or recklessly." *In re Hertz Glob. Holdings Inc*, 905 F.3d 106, 114 (3d Cir. 2018) (quoting *Avaya*, 564 F.3d at 252).

A strong inference of scienter is pled "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324 (2007). That is not to say, however, that a plaintiff must "come forward with 'smoking-gun' evidence to meet the PSLRA's pleading requirements." *In re Hertz Glob. Holdings Inc*, 905 F.3d at 114. "Rather, in conducting the scienter

analysis, courts must analyze the complaint holistically to determine whether its allegations, 'taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *Tellabs,* 551 U.S. at 323. "'In assessing the allegations holistically as required by *Tellabs,* the federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective.'" *Avaya,* 564 F.3d at 272-73 (3d Cir. 2009) (quoting *S. Ferry LP, No. 2 v. Killinger,* 542 F.3d 776, 784 (9th Cir. 2008)). Thus the case may be a circumstantial one, but the requirement of a strong inference of scienter is not thereby undermined. *See In re Burlington Coat Factory Sec. Lit.,* 114 F. 3d 1410, 1418 (3d Cir. 1997) ("The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.") (quoting *Acito v. IMCERA Group, Inc.,* 47 F. 3d 47, 52 (2d Cir. 1995)).

Applying that standard, I will discuss each alleged basis for scienter and evaluate the potential plausible opposing inferences. The inquiry remains, however, whether the allegations *as a whole* support a strong inference of scienter. *In re Toronto-Dominion Bank Sec. Litig.,* No. 17-1665, 2018 WL 6381882, at *12 (D.N.J. Dec. 6, 2018).

China Zenix's knowledge is imputed through principles of *respondeat superior,* so its scienter necessarily depends on the knowledge of its employees. Here, the relevant employees are Cheung and Lai.

As to Cheung, the only relevant fact pled is that he was the Chief Financial Officer of the Company. (1AC ¶ 21). Beyond that, the complaint offers no specific allegations of Cheung's knowledge, and Plaintiffs do not point to any such facts in their briefing. Plaintiffs have therefore failed to allege that Cheung acted with the requisite scienter, and the Section 10(b) claim must be dismissed as to him individually.

16

As to Lai, however, the complaint does adequately set forth allegations of knowledge that the statements were misleading. Scienter is knowledge that the statements were misleading and an intent for them to be so. It is a commonsense inference that the Company's CEO was familiar with the existence and contents of the press releases and annual reports. But Lai cannot have intended the statements to be *misleading* unless he knew about the underlying stock manipulation scheme.

The factual allegations regarding Lai's knowledge of the scheme may be summarized as follows: (1) He is the founder, Chairman and CEO of the Company (1AC ¶ 20); (2) he indirectly owns approximately 70% of the ADS (*Id.* ¶ 28); and (3) he runs the Company like a family business, having installed multiple relatives in senior executive positions (*Id.* ¶ 29). Also relevant to the inference of scienter are four additional facts: (4) No other director or executive officer of the Company owns more than 1% of the Company's total outstanding ordinary shares (*Id.* ¶ 32); (5) the Company has not offered employees the opportunity to own shares in the Company (*Id.* ¶ 33); (6) the NYSE's investigation of the Company, according to its disclosure in the 2017 Annual Report, questioned improper trading by "certain persons, including a number of Company employees" (*Id.* ¶ 54); and (7) the NYSE delisted the Company following that investigation for actions in contravention of public policy (1AC ¶ 56).

Plaintiffs' case is concededly a circumstantial one. Lai controlled the Company as if it were a family business and was the only person who owned a significant portion of it. The NYSE evidently believed that Company employees were involved in the manipulation scheme. Given his control, if any of his employees were improperly trading, then he must have been aware of it, even if he did not directly participate. And indeed, the employees' improper trading is most easily understood as having been done at the behest of Lai; it would not have benefited themselves, but him. And assuming Lai was aware of the

scheme, then he must have intended to mislead investors by not disclosing the scheme in the various statements and disclosures.

Plaintiffs argue conversely that the innocent counter-inference is simply implausible. That innocent inference would be that certain Company employees with no significant financial stake in the Company independently conspired to keep the Company listed on the NYSE, to the benefit of the Company's CEO and only major stockholder, but without his knowledge.

Defendants draw a different inference from the employees' lack of a significant stake in the stock trading scheme. Because the Company employees are not allowed to own stock in the Company, say Defendants, "there is *no* connection between the Defendants and Company employees when it comes to stock ownership and trading." (Def. Brf. at 11). While it may be true that the employees had nothing to gain from the stock trading scheme, they were subject to taking instructions and orders from Lai, who is alleged to run the Company like a family business.

Other innocent inferences can be imagined. It could be that the NYSE was mistaken, and that any improper trading was unrelated to Company employees or executives. Or the NYSE's decision to delist the Company could have had nothing to do with improper trading, despite its statements at the time. All of this does not rise above the level of speculation, however.

It is true that the Defendants disclosed the NYSE's inquiry in the 2017 Annual Report, which they say rebuts any intent to conceal. But that was only a disclosure of the existence of the inquiry, not a disclosure of improper trading. If Defendants had disclosed, for example, that they had uncovered improper trading by Company employees, that might support an inference that the Defendants (specifically Lai) were not culpable. But that was not the nature of the disclosure.

To support an adequate plea of the scienter element, the Plaintiffs' guilty inference need not be the most likely one, or even more likely than not. It need only be at least as likely as the competing inferences. I find that the inference

that Lai was aware of the improper trading and consciously failed to disclose it is more likely than the competing innocent inferences. Considering the complaint as a whole and in the context of the competing innocent inferences, I find that it adequately alleges that Lai possessed scienter when making the allegedly misleading statements in the October 2015 and September 2016 Press Releases, as well as the 2017 Annual Report and SOX.

Defendants separately argue that the Plaintiffs overstate Lai's motive and opportunity to commit the fraudulent conduct. Whether or not that is accurate, I need not consider motive and opportunity separately. Analysis of motive and opportunity can give rise to a strong inference of scienter. But they are not elements as such; what is necessary is to plead facts that give rise to an inference of conscious wrongdoing that is just as likely as an innocent inference.

I therefore find that the First Amended Complaint pleads facts giving rise to a strong inference of scienter by Lai and, through *respondeat superior*, the Company. Plaintiffs have not pled facts giving rise to an inference of scienter by Cheung.

### 3.  *Loss Causation*

To prevail in a private securities fraud action, plaintiff investors must prove "loss causation." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 807 (2011); *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). This requires that the plaintiffs demonstrate that the defendants' deceptive conduct caused their claimed economic loss. *Erica P. John Fund*, 563 U.S. at 807; *see In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 630-31 (3d Cir. 2011); *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425 (3d Cir. 2007). Loss causation has been codified in the PSLRA, which requires that "the plaintiff shall have the burden of proving that the act or omission of the defendant ... caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4).

"The loss causation inquiry typically examines how directly the subject of the fraudulent statement caused the loss, and whether the resulting loss was a

foreseeable outcome of the fraudulent statement." *McCabe*, 494 F.3d at 430-31 (internal quotation marks and alteration omitted). The Third Circuit takes a "practical approach [to loss causation], in effect applying general causation principles." *Id.* at 426 (citing *EP MedSystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3d Cir. 2000) ); *see Pure Earth, Inc. v. Call*, 618 F. App'x 119, 123 (3d Cir. 2015) (recognizing that district court properly considered "general principles of causation, such as materiality, directness, foreseeability, and intervening causes."). "In order to satisfy the loss causation requirement . . . , the plaintiff must show that the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss." *McCabe*, 494 F.3d at 426; *see Semerenko*, 223 F.3d at 184-85 (noting that loss causation element is satisfied when plaintiff shows that price of security at time of purchase was inflated "due to an alleged misrepresentation," and that misrepresentation "proximately caused the decline in the security's value").

In the Third Circuit, the loss causation analysis differs as between typical and non-typical Section 10(b) claims. *McCabe*, 494 F.3d at 425; *see Pure Earth*, 618 F. App'x at 122. A typical Section 10(b) claim is that the defendant made material public misrepresentations or omissions in order to affect the price of a publicly traded stock. This is sometimes referred to as fraud on the market. *McCabe*, 494 F.3d at 425 n.2; *see, e.g.*, *Semerenko*, 223 F.3d at 169 (misstating earnings reports in a public statement). A non-typical case, in contrast, involves a misrepresentation or omission that directly induces a particular party to enter into a private transaction. *See McCabe*, 494 F.3d at 420-21 (involving non-typical case of individualized misrepresentation inducing investors to purchase stock). *See also Pure Earth, Inc. v. Call*, 531 F. App'x 256, 260 (3d Cir. 2013) ("public announcements are made to the market at large in a typical § 10(b) claim, but in a non-typical § 10(b) claim, private misrepresentations are made to induce a particular individual to buy or sell securities.").

What is alleged here is a typical § 10(b) case, involving public misstatements that are "made to artificially inflate the pricing of a security in the public markets." *Id.* (citing *McCabe*, 494 F.3d at 425). To establish loss causation in a typical § 10(b) case, a plaintiff must show that its "losses are related specifically to the market's discovery of the misrepresentation and the corresponding decrease in price due to that misrepresentation." *Id.*; *see Payne v. DeLuca*, 433 F.Supp.2d 547, 607 (W.D. Pa. 2006) ("to successfully allege a cause of action, a plaintiff must allege that the share price fell significantly after the truth about the misstatement or omission became known.").[3]

One way to establish loss causation is by means of a corrective-disclosure theory. *In re Initial Public Offering Securities Litig.*, 399 F.Supp.2d 298, 307 (S.D.N.Y. 2005). After a misrepresentation has been made, a corrective disclosure reveals "the falsity of the alleged misrepresentation, and [introduces] ... new information to the market," generally resulting in a price correction. *In re DVI, Inc. Sec. Litig.*, 2010 U.S. Dist. LEXIS 92888, at *24 (E.D. Pa. Sep. 3, 2010), aff'd, 639 F.3d 623 (3d Cir. 2011) (*citing In re Retek Inc. Sec. Litig.*, 621 F.Supp.2d 690, 698 (D. Minn. 2009); *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F.Supp.2d 546, 551 (S.D.N.Y. 2008). To be significant, such a corrective disclosure "must at least relate back to the misrepresentation and not to some other negative information about the company." *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009); *see also Lentell v. Merrill Lynch*, 396 F.3d 161, 173 (2d Cir. 2005) (providing that plaintiff must allege "that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered,' *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.") (emphasis in original) (quoting *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001)), *cert. denied*, 546 U.S.

---

[3]   The theory here has an additional component. The value of the shares would not merely have been lower absent the manipulation; it would have been low enough to result in delisting, a circumstance that could further devalue the stock in investors' eyes.

935 (2005). The corrective disclosure "need not," however "precisely mirror the earlier misrepresentation." *In re DVI, Inc. Sec. Litig.*, 2010 U.S. Dist. LEXIS 92888, at *26 (quotation and citations omitted). Nor need the corrective disclosure occur all at once; "[i]nstead, the truth may be revealed through a series of partial disclosures through which the truth gradually 'leaks out.'" *Id.* at *27, (citations omitted); *see Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 472 (4th Cir. 2011) ("neither a single complete disclosure nor a fact-for-fact disclosure of the relevant truth to the market is a necessary prerequisite to establishing loss causation (although either may be sufficient)").

The Third Circuit has stated that loss causation is ordinarily an issue for the trier of fact. *See EP Medsystems*, 235 F.3d at 884. What is required at the pleading stage is that the plaintiff provide the defendant "with some indication of the loss and the causal connection that he has in mind." *Dura*, 544 U.S. at 347. "[T]he plaintiff is required to plead that the decline in the stock price was caused by the market's discovery of defendant's fraud." *In re Intelligroup Sec. Litig.*, 527 F.Supp.2d 262, 295 (D.N.J. 2007). A complaint is not required to "plead facts indicating that disclosure of the alleged fraud was the sole reason for the investment's decline in value," but "in order to survive defendants' motion to dismiss, the complaint must contain facts sufficient to indicate that disclosure of the alleged fraud directly and proximately caused the investment's decline in value or, at the very least, substantially contribut[ed to] the damages sustained by the plaintiff." *Id.* at 297 (internal citations and quotations omitted); *see Semerenko*, 223 F.3d at 186 (holding that plaintiffs pled loss causation where they alleged that stock price was inflated by misrepresentations concerning defendant's financial condition and its willingness to complete proposed merger, and that price dropped when truth was made known by audit report that included findings of "fraudulent financial reporting" and the announced termination of the planned merger).

Plaintiffs' contention here is that the stock price plummeted once the Company revealed it had been delisted following the NYSE investigation. On

this theory, the June 2018 Press Release was a corrective disclosure. Defendants respond that there was no corrective disclosure *of the improper trading* since the Company merely reported that it was being delisted.

The subject of the misleading statements was trading practices in 2015 and 2016. Plaintiffs allege that these actions are what led to the drastic loss in stock value. The question is then whether the delisting announcements by the Company and the NYSE qualify as "disclosures" of the improper trading. The June 2018 Press Release certainly falls short of a confession that any Company employees improperly traded. But it does tie the NYSE's delisting decision to allegations of improper trading leveled at the Company by the NYSE. While it did not "precisely mirror" the fact of improper trading, it did permit the market to infer that improper trading had occurred. These announcements injected into the market's pricing mechanism the wrongdoing which the Company had failed to disclose in the October 2015 and September 2016 Press Releases, and failed to fully disclose in the 2017 Annual Report. And the price dropped precipitously.

Defendants' contentions amount to a maximalist position that only an outright admission of improper trading could support a finding of loss causation. (Def. Brf. 16-17; Def. Reply Brf. 8-9). Under the cases cited above, that is not the test; moreover, it cannot be the test, since disclosures of investigations of potential wrongdoing have been found sufficient for a showing of loss causation. *See Hull v. Global Digital Solutions, Inc.*, No. 16-cv-5153, 2017 WL 6493148, at *15 (D.N.J. Dec. 19, 2017) (collecting cases demonstrating that "various courts have held that allegations that a company was the subject of SEC investigations are sufficient to meet the pleading requirement for loss causation.").

True, Plaintiffs have not proven that the Defendants actually traded improperly, or that they expressly disclosed prior improper trading. But Defendants' admission in the June 2018 Press Release that the NYSE had delisted the Company for reasons relating to the events described in the

23

October 2015 Press Release, September 2016 Press Release, and the 2017 Annual Report, can reasonably be viewed as a corrective disclosure. Plaintiffs have also shown that immediately following this corrective disclosure, the stock price plummeted by 42% in a single day. That is sufficient, not necessarily to prove, but to plead, loss causation.

Accordingly, having pled the necessary elements of Section 10(b) liability as to Defendant Jianhui Lai for the October 2015 and September 2016 Press Releases, the 2017 Annual Report, and the 2017 SOX, the motion to dismiss Count One against him is denied. Through *respondeat superior*, liability can be extended to Defendant China Zenix, and the motion to dismiss Count One as against China Zenix is denied as well. Because Plaintiffs have failed to plead scienter or otherwise to allege actionable behavior as to Defendant Martin Cheung, the motion to dismiss Count One against him is granted.

## B. Section 20(a) of the Exchange Act (Count Two)

Defendants seek to dismiss Plaintiffs' Section 20(a) "control person" claims against Lai and Cheung for failure to plead underlying violations that would give rise to Section 20(a) liability.

> Section 20(a) of the Exchange Act creates a cause of action against individual defendants alleged to have been "control persons" of companies guilty of securities fraud. Section 20(a) provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter ... shall also be liable jointly and severally with and to the same extent as such controlled person" unless the purported control person can demonstrate that he "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S .C. § 78t. To state a Section 20(a) claim, a plaintiff "must plead facts showing: (1) an underlying violation by the company; and (2) circumstances establishing defendant's control over the company's actions." *Jones v. Intelli–Check, Inc.*, 274 F. Supp. 2d 615, 645 (D.N.J. 2003).

*Dudley v. Haub*, No. 11-cv-05196, 2013 WL 1845519, at *20 (D.N.J. Apr. 30, 2013). Claims under Section 20(a) therefore, are "derivative—

requiring proof of a separate underlying violation of the Exchange Act." *In re Milestone Scientific Sec. Litig.*, 103 F. Supp. 2d 425, 474 (D.N.J. 2000).

China Zenix's liability under the Exchange Act has been established. *See* Section III.A, *supra.* As for the second prong, both Lai and Cheung were high-level officers of the Company during the Class Period, with control over the Company's SEC filings. That status easily places them within the definition of "control persons" for Section 20(a) liability. *Dudley*, 2013 WL 1845519 at *20.

One potential wrinkle in this analysis is whether the complaint must allege the control person's culpable participation in the underlying violation. This has been established for Lai, but not for Cheung. Although courts within the Third Circuit are split on this issue, the "overwhelming trend" is that culpable participation need not be pled to survive a motion to dismiss. *See id.* at * 20 n.5. Therefore, Plaintiffs have adequately pled a Section 20(a) violation against both Lai and Cheung.

### C. Exchange Act Section 9(a)(2) (Count Three)

Plaintiffs allege that the Defendants violated Sections 9(a) and 9(f) of the Exchange Act. In their opposition to the motion to dismiss, Plaintiffs address only Section 9(a)(2) specifically. (Pl. Opp. at 25-27). I take that as a concession that they are pursuing a 9(a)(2) theory, and confine my analysis accordingly.

Section 9(a)(2) of the Exchange Act makes it unlawful for any person

> [t]o effect, alone or with 1 or more other persons, a series of transactions in any security registered on a national securities exchange, any security not so registered, or in connection with any security-based swap or security-based swap agreement with respect to such security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

15 U.S.C. § 78i(a)(2). A Section 9(a)(2) claim has five essential elements: that "(1) a series of transactions in a security creating actual or apparent

trading in that security or raising or depressing the price of that security, (2) carried out with scienter, (3) for the purpose of inducing the security's sale or purchase by others, (4) was relied on by the plaintiff, (5) and affected plaintiff's purchase or selling price." *Fezzani v. Bear, Stearns & Co., Inc.*, 384 F. Supp. 2d 618 (S.D.N.Y. 2004).

Here, Plaintiffs have not sufficiently alleged a series of transactions. The only relevant allegation is that Company employees traded the ADS in an improper manner. There is no explanation of who traded, or when and how they traded. While such a vague description of an improper trading scheme might have been sufficient to allege a misleading disclosure, it is not sufficient for a charge of market manipulation. Defendants are not put on notice as to what trades are at issue.

Moreover, even if the Plaintiffs did describe a series of transactions more specifically, there are no acts that could give rise to an inference of 9(a) scienter. The closest case would be defendant Lai. Plaintiffs argue that scienter can be carried over from the Section 10(b) claims. Section 10(b), however, requires only an inference that Lai knew of improper trading and failed to disclose it; Section 9(a)(2) requires some level of culpable participation in the trading itself, which is not alleged as to Lai and is more difficult to infer from the circumstances. Should discovery reveal such evidence, the plaintiffs may move to amend.

Plaintiffs have not pled enough facts about the alleged manipulation scheme to support a Section 9(a)(2) claim. Count Three is therefore dismissed.

26

### D. Personal Jurisdiction

Defendants argue that this Court lacks specific personal jurisdiction over Lai and Cheung.[4] I disagree.

> For a court to properly exercise specific personal jurisdiction, the litigation must arise out of in-forum activities or activities directed toward the forum, and "it is essential ... that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum [State], thus invoking the benefits and protection of its laws." *See Covenant Bank for Savings v. Cohen,* 806 F. Supp. 52, 56 (D.N.J. 1992) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958)).
>
> A court must also consider whether exercising jurisdiction over the defendant would violate traditional notions of "fair play and substantial justice." *Int'l Shoe Co. v. State of Wash., etc.,* 326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95 (1945). A court may not exercise jurisdiction in such a way as to make litigation "so gravely difficult and inconvenient that a party is at a severe disadvantage to his opponent." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 478, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985).

*In re Royal Dutch/Shell Transport Sec. Litig.*, 380 F. Supp. 2d 509, 549-550 (D.N.J. 2005).

In this case, the appropriate "forum" of which defendants must have purposefully availed themselves is not New Jersey, but the United States. The Exchange Act allows for nationwide service of process. *See* 15. U.S.C. § 78aa. For violations of statutes which allow for nationwide service of process, the appropriate analysis is whether the defendants have minimum contacts with the United States generally, not the state in

---

[4]    Technically this aspect of the motion is brought under Rule 12(b)(2), Fed. R. Civ. P. Because it is a facial attack on the pleadings which does not rely on extrinsic evidence, it is subject to the ordinary Rule 12(b)(6) standard of review. *See Arrington v. Colortyme, Inc.*, 972 F. Supp. 2d 733, 739 (3d Cir. 2013) ("In a facial attack, the defendant contests the sufficiency of the well-pleaded allegations insofar as they provide a basis for the court's exercise of subject-matter jurisdiction; as under Rule 12(b)(6), the court must treat the complaint's well-pleaded jurisdictional facts as true and view them in the light most favorable to the plaintiff.").

which the federal court sits. *See Pinker v. Roche Holdings Ltd.*, 292 F. 3d 361, 369 (3d Cir. 2002).

SEC filings, such as the 2017 Annual Report and the Form 6K which included the October 2015 and the September 2016 Press Releases, can give rise to specific personal jurisdiction over the control persons of the company making the filing. *See In re Royal Dutch*, 380 F. Supp. 2d at 551 ("United States courts have frequently asserted personal jurisdiction over individual defendants who sign or, as control persons, approve the filing or disseminating of, particular forms required by the SEC which they knew or should have known would be relied on by U.S. investors.") (quoting *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 352 (D. Md. 2004); *Derensis v. Coopers & Lybrand Chartered Accountants*, 930 F. Supp. 1003, 1014 (D.N.J. 1996) (concluding that two company officers were subject to jurisdiction of the court because plaintiffs had made a *prima facie* showing they were "controlling persons.").

Defendants argue that an individual's position in the corporation cannot alone be the basis of personal jurisdiction. (Def. Brf. at 25). That proposition is good as far as it goes, but not helpful to Lai and Cheung here. Defendants cite cases holding that mere status as a board member is insufficient to establish jurisdiction. *See In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 467 (S.D.N.Y. 2008); *In re Alstom SA*, 406 F. Supp. 2d 346, 399 (S.D.N.Y. 2005). Lai and Cheung, however, are control persons who actively managed the Company and its actions. Moreover, the Plaintiffs have plausibly alleged that Lai consciously intended the SEC filings to deceive investors. As for Cheung, he is subject to jurisdiction for signing the very filings alleged to be misleading.[5] *See In re*

---

[5]   Both the October 2015 Press Release and the September 2016 Press Release were filed alongside Form 6-K with the SEC. These filings were signed by Cheung.

*Alstom*, 406 F. Supp. 2d at 399 ("The signing of documents filed with the SEC which form the basis for Plaintiff's claims is sufficient contact with the jurisdiction to justify this Court's exercise of jurisdiction over [the signatory.]").

Defendants, looking ahead to the merits, make the facile point that the court lacks jurisdiction over them because they did nothing wrong—*i.e.,* that because the filings are not actionable, no one responsible for them is thereby subject to this Court's jurisdiction. But some of those filings were actionable, *see supra,* and Lai and Cheung are responsible for them as control persons and signatories. Defendants do not put forth any argument that it would violate fair play or justice to subject control persons of a company which traded on the NYSE and filed documents with the SEC to jurisdiction in the United States. Accordingly, I find that this Court has specific personal jurisdiction over both Lai and Cheung.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED** as to Count Three (Section 9(a) of the Exchange Act). Count One (Section 10(b) of the Exchange Act) is dismissed as to Defendant Cheung only. The Defendants' motion to dismiss the first amended complaint for failure to state a claim and for lack of personal jurisdiction is otherwise **DENIED**.

Dated:  June 12, 2020

/s/ Kevin McNulty

_____

**HON. KEVIN MCNULTY, U.S.D.J.**

---

Cheung also signed the 2017 SOX. Courts may take judicial notice of SEC filings in a securities fraud case. *See Oran v. Stafford*, 226 F. 3d 275, 289 (3d Cir. 2000).